**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **vs.** § | |
| § **Civil Action No.: 1:21-cv-235** | |
| **PAUL W. HAARMAN, PATRICK E. DUKE, and** § | |
| **APEG ENERGY GP, LLC,** § | |
| § | |
| **Defendants.** § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants Paul W. Haarman ("Haarman"), Patrick E. Duke ("Duke"), and APEG Energy GP, LLC ("APEG") (collectively "Defendants"), and alleges as follows:

### I.
### SUMMARY

1.      From approximately December 2015 to October 2016, Haarman and Duke used APEG to execute a fraudulent investment scheme that raised more than $17.4 million from 115 investors through the sale of limited partnership securities in APEG Energy, LP (the "Fund"), an investment fund focused on the oil and gas industry.  Through a series of misrepresentations and omissions, a deceptive scheme, and with utter disregard of the fiduciary duty owed by Defendants to the Fund, Haarman and Duke lined their pockets with nearly $2.7 million to the detriment of investors and the Fund.

2.      Defendants made numerous factual misrepresentations and omissions in their offering documents, written communications, and oral statements regarding, *inter alia*, the risks

of the investments, Duke's expertise in the oil and gas industry, and Defendants' compensation for managing the Fund.  First, Haarman promised investors in writing and during phone calls guaranteed returns with no risk and that the investments were hedged against future declines in oil prices.  This was false.  The Fund faced significant risks including but not limited to uncertainties of the actual oil-and-gas production revenue and the impact of fluctuations in the price of oil on the promised investor returns.  And contrary to Haarman's statements, Defendants did not employ any mechanisms to hedge against such price fluctuations.  Second, Defendants falsely portrayed Duke as a sophisticated and experienced oil-and-gas exploration businessman.  In actuality, Duke's experience amounted to a part-time, high-school job with a regulatory agency and a college job with an oil-and-gas company more than 25 years before the Fund offering.  And Duke had little, if any, experience in the unique oil-and-gas *exploration* industry.  Third, the Fund's PPM and partnership agreement provided that APEG's compensation was limited to a 2% fee for managing the Fund, which included identifying, acquiring, and making all decisions concerning securities investments by the Fund.  However, instead of putting the Fund's interests first, Haarman and Duke structured asset acquisitions on behalf of the Fund so that they personally received nearly $2.7 million in illicit payments.  Defendants concealed these payments from the Fund and its investors, and failed to disclose the conflicts of interest involved in the transactions.

3.     APEG, Haarman, and Duke also served as investment advisers to the Fund.  They, therefore, owed the Fund a fiduciary duty.  Defendants breached that fiduciary duty by, among other things, structuring asset acquisitions on behalf of the Fund so that Haarman and Duke personally received nearly $2.7 million in illicit payments.  Defendants concealed these payments from the Fund and its investors, and failed to disclose the conflicts of interest involved in the transactions.

4.     By committing the acts alleged in this Complaint, Defendants directly or indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate the antifraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)].

5.     In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against Defendants seeking: (a) permanent injunctive relief; (b) disgorgement of ill-gotten gains; (c) accrued prejudgment interest on those ill-gotten gains; (d) civil penalties; and (e) all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## II.
## JURISDICTION AND VENUE

6.     This case involves the offer and sale of limited partnership interests, which are investment contracts, and thus securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].  Thus, the Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.     In addition, APEG, Haarman, and Duke served as investment advisers as that term is defined in Section 202(a)(11) of the Advisers Act.  Thus, the Court also has jurisdiction over this action under Sections 209(c) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(c) and 80b-14].

8.     Defendants directly and/or indirectly made use of the mails and/or of the means and

instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this Complaint.

9.      Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within the Western District of Texas, Austin Division, including but not limited to Defendants' sales of securities, misrepresentations, acts, practices, transactions, and courses of business.  Further, Haarman and Duke reside in Hays County and Travis County, respectively, both of which are served by this Division.

### III.
### DEFENDANTS

10.      APEG is a private limited liability company formed in Texas on December 22, 2015, and based in Austin, Texas.

11.      Duke, age 57, resides in Austin, Texas, and has been one of the two principals and co-owners of APEG since inception in 2015.

12.      Haarman, age 60, resides in Dripping Springs, Texas, and has been one of the two principals and co-owners of APEG since inception in 2015.

### IV.
### RELATED ENTITIES

13.      APEG Energy, LP (previously defined as the "Fund") is a private Texas limited partnership formed on January 1, 2016, with its principal place of business in Austin, Texas. APEG serves as the Fund's general partner, while 115 investors make up its limited partners.

14.      Angelus Private Equity Group, LLC ("Angelus") is a private Texas limited liability company formed in July 2015 with its principal place of business in Austin, Texas.  It is beneficially co-owned by Haarman and Duke, who operate the company as its sole managers. Angelus serves as an umbrella company through which Haarman and Duke form and manage private investment partnerships.

15.     Angelus Capital, LLC ("Angelus Capital") is a private Texas limited liability company formed on December 22, 2015, with its principal place of business in Austin, Texas.  It is wholly owned by Angelus, and it wholly owns APEG.  It is operated and beneficially owned by Haarman and Duke.

**V.**
**STATEMENT OF FACTS**

**A.      Haarman and Duke's Creation and Control of the Fund**

16.     Haarman and Duke formed the Fund on January 1, 2016, as an investment opportunity offered under the umbrella of Angelus, a private-equity firm they jointly operated and co-owned.  The stated purpose of the Fund was to "engage solely in the business of acquiring, owning, holding and disposing of investments in the energy sector, as may be identified from time to time by [APEG]."  The Fund sought to realize an aggregate of 25% annualized returns for investors over the course of three to four years.  From December 2015 through October 2016, Haarman and Duke raised approximately $17.4 million from 115 investors to capitalize the Fund.

17.     Haarman and Duke co-managed the Fund as the sole managers of APEG, which served as the Fund's general partner.  Angelus Capital wholly owns APEG.  Angelus Capital is, in turn, a wholly owned subsidiary of Angelus.  Haarman and Duke, in turn, each own 50% of Angelus through two companies: one wholly owned by Haarman and one wholly owned by Duke. The diagram below illustrates the Fund's ownership structure:



18.    In their capacity as APEG's lone managers, Haarman and Duke had exclusive control over APEG.  They contributed to, reviewed, and approved the Fund's Private Placement Memorandum ("PPM") prior to dissemination to investors.  They each also approved every prospective investment by the Fund prior to acquisition.

19.    Haarman and Duke divided other tasks based on their backgrounds.  Haarman took the lead in soliciting investors to capitalize the Fund and communicated with them after their initial investments.  To solicit investments in the Fund, Haarman targeted subscribers to his "financial literacy" website—Shift Evolution.  For an annual fee ranging from $800 to $1,500, Shift Evolution subscribers could access lessons on various financial topics such as compound interest and oil-and-gas investing.  Haarman also used his website to market and sell life insurance to subscribers and to solicit them to invest in Angelus private-equity deals, including the Fund. Haarman advised subscribers to borrow against their life-insurance policies to invest in the private-equity deals.  Ultimately, Shift Evolution subscribers made up 100% of the Fund's investors.

20.    On the other hand, Duke, who claimed to have oil-and-gas experience, took the lead

in identifying and vetting oil-and-gas assets for the Fund to purchase.

**B.      Investors Invested in the Fund by Purchasing Limited Partnership Interests**

21.      To invest in the Fund, potential investors executed an Agreement of Limited Partnership of APEG Energy, LP ("Partnership Agreement") and a Subscription Agreement provided by Haarman and Duke.  Through their investments, investors became limited partners in the Fund.  The PPM and Partnership Agreement stated that the investors would receive, based on the Fund's performance, certain distributions including a quarterly distribution equal to 10% of capital contributions and a final distribution upon liquidation equal to 15% of capital contributions. Each distribution was calculated on an annualized basis.

22.      As specified in the Partnership Agreement, the Fund's purpose was to "engage solely in the business of acquiring, owning, holding and disposing of investments in the energy sector, as may be identified from time to time by [APEG], in its sole discretion."  The Partnership Agreement defined these investments as "Portfolio Securities", which included "without limitation, stocks, bonds, debt, options, commodities and derivatives."  The Partnership Agreement vested APEG with complete control over the Fund's management and operations including the decisions regarding what investments the Fund would pursue.  Thus, Haarman and Duke, by virtue of their control of APEG, had the prerogative to invest the Fund's assets as they saw fit; be it in oil-and-gas asset acquisitions, stocks, or any of the other enumerated Portfolio Securities. Haarman and Duke ultimately decided not to invest in stocks or other enumerated Portfolio Securities, and instead selected oil-and-gas assets as discussed in Section V.C.iii., below.

23.      In exchange for these advisory and management services, the Partnership Agreement specified that APEG was entitled to a management fee paid semi-annually equal to 2% of the Fund's "asset value."  The Partnership Agreement provided that APEG was not entitled to

any fees in compensation for its services other than the management fee.[1]  The Fund paid APEG management fees totaling $120,810 in 2016 and $603,750 in 2017.

24.     The Partnership Agreement required each investor to become a member of APEG IDA Fund, LLC ("APEG IDA"), an APEG affiliate controlled by Haarman and Duke.  Haarman and Duke opened a separate APEG IDA bank account for each investor.  Investors deposited into their respective APEG IDA accounts a sum equal to the amount they intended to invest in the Fund plus an additional $200 in order to maintain a minimum account value.  The Fund's Subscription Agreement required investors to email Haarman a "Capital Distribution Request Form," directing their respective APEG IDA accounts to deliver their capital contributions to the Fund.

## C.     APEG, Duke, and Haarman Made Untrue and Misleading Statements in the Fund Offering

25.     In order to lure in, and later lull, the Fund investors, Defendants made a number of material misrepresentations and omissions regarding the risks and rewards of investing in the Fund, Duke's background in the oil-and-gas industry, and the surreptitious, handsome profits Haarman and Duke enjoyed at the expense of the Fund and its investors.

### i.     Haarman Promised Guaranteed Returns With No Risk

26.     Beginning at least as early as December 2015, Haarman began soliciting his Shift Evolution subscribers to purchase interests in the Fund.  From December 15, 2015, through December 30, 2015, Haarman emailed investors, describing the Fund and its expected success investing in oil-and-gas assets.  At the time of the emails, as described in detail below, Haarman and Duke were negotiating the purchase of multiple oil-and-gas assets from Company A, an unaffiliated public company that was preparing to file bankruptcy.  In the emails, Haarman made

---

[1]  APEG's compensation was not limited to the 2% management fee.  The Partnership Agreement included an incentive for APEG to receive a distribution of 100% of the Fund's assets remaining after the Fund had returned all capital contributions, plus certain preferred distributions.  In addition, APEG received distributions equal to its tax liability for its share of Fund income.

the following false and misleading statements:

| HAARMAN'S STATEMENTS | REALITY |
|---|---|
| The "production of these wells are hedged from day one" against any future decline in oil prices, and "[t]here is ZERO possibility of anyone losing their principle on account of all of the safety measures we have in place.  And that is what guarantees that the production revenue will never decline regardless of what happens in the market." | No measures were in place to prevent principal loss or otherwise to guarantee production revenue. |
| "[D]on't be stupid!  You are looking at a gift horse in the mouth right now.  You have a GUARANTEED return of 25% staring at you right now.  . . . I promise you that you will make a ton of money." | No measures were in place to prevent principal loss or otherwise to guarantee production revenue. |
| This "deal will provide a steady very steady return that will hit the 25% for the entire duration."  "If it were me, I would put everything I have available [into it]." | Haarman had no reasonable basis to project steady returns of 25% given that he and Duke had yet to identify and/or purchase all of the assets for the Partnership.  Notably, Haarman never invested his own money in the Fund. |
| "We [as] a company, along with our operating partners, make NO money until after you have made a cumulative total of 25% of your funds during the time period your money has been invested." | In addition to 2% management fees, Haarman and Duke received $1,663,500 from the investment proceeds in connection with the Fund's first asset acquisition.  In later acquisitions, they received payments totaling $990,000, even though the Fund had not (and still has not) returned investors' initial investment. |

### ii.    The PPM's Misleading Statements Concerning Duke's Background and Experience

27.    In a section identifying Haarman and Duke as APEG's two principals, the PPM described their purported backgrounds and experience.  Haarman and Duke each drafted their own portion.  Duke's entry portrayed him as having significant experience in the oil-and-gas industry, stating in relevant part:

> [Duke] is also the founder, President and Managing Director of Duke Capital Management, a private boutique investment banking firm based in Houston, Texas.  Prior to founding Duke Capital Management, Patrick worked for the Texas Railroad Commission which is the Oil and Gas regulatory Agency for the State.  Patrick paid for his college studies by working on Oil and Gas rigs both on and offshore.  Patrick has been involved in over $150,000,000 in Oil and Gas transactions, predominately onshore.   Along with two

others, Patrick built an oil and gas exploration company that sold to
Placid Oil Company which is owned by the Hunt Family in Dallas,
Texas.

28.     Duke's biographical information was materially misleading.  First, it conveyed the
impression that Duke served at the Texas Railroad Commission ("TRC") in a relevant position
immediately before founding Duke Capital Management.  Duke Capital Management was an
assumed name of Duke Capital, which Duke formed in September 2013.  But, in fact, Duke left
the TRC more than 33 years earlier.  He worked there from June 1980 to October 1982, but not in
an engineering, geosciences, or other position that required specialized training, knowledge, or
experience in the oil-and-gas industry.  For his entire TRC tenure, which began while he was a 17-
year-old high-school student, Duke provided clerical services as a part-time clerk.

29.     Second, Duke's claims to have been involved in over $150,000,000 in oil-and-gas
transactions and to have built and sold an oil-and-gas exploration company were also misleading.
In context, these claims conveyed the impression that Duke had an extensive oil-and-gas career,
culminating in the successful sale of an oil-and-gas exploration company that he and two others
owned.  In reality, all of Duke's purported oil-and-gas experience took place within a relatively
short period in the mid-1980s, involved no oil-and-gas *exploration* activity, and yielded relatively
little, if any, profit to him.  During sworn testimony, Duke described his actual experience to be
"part-time deal where you'd go out on weekends and rework wells.  That's what, you know, a
couple of kids were doing with their spare time to make money."

30.     Finally, despite touting his purported investment banking and oil-and-gas
experience dating back to the 1980s, Duke omitted other relevant information concerning his
background in the same period.  For example, he did not disclose that he had not worked in the
oil-and-gas industry at all since the 1980s.  And he failed to disclose that he filed personal
bankruptcy in 2005, seeking to discharge consumer debt ranging from $500,001 to $1 million.

### iii.    Haarman and Duke's Undisclosed Payments From the Fund

31.    From January 2016 to October 2016, Defendants purchased oil-and-gas assets for the Fund from four unaffiliated companies:  (1) Company A; (2) Company B; (3) Company C; and (4) Company D.  Instead of putting the interests of the Fund first, and in contrast to representations made in the PPM, Haarman and Duke misappropriated, or otherwise improperly diverted to themselves, nearly $2.7 million.  This amount includes $2,563,550 in purported "consulting fees," "acquisition fees," and "bonuses."   Notably, neither the PPM nor the Partnership Agreement provided for such payments.  To the contrary, the Partnership Agreement only specified a 2% management fee to APEG.  In addition, Haarman and Duke misappropriated $90,000, which represented an arbitration settlement with Company B.   Defendants failed to disclose these payments to the Fund or its investors when disclosing the asset transactions.[2]

### a.    Company A Transaction

32.    Haarman and Duke first executed a series of maneuvers to lead investors to believe they were acquiring Fund assets for a higher price so that they could pocket a handsome and instantaneous profit at the expense of the Fund and its investors.  Haarman and Duke initially sought to raise $12 million for the Fund.  In the December 28, 2015 PPM, Duke and Haarman described a $12 million capital raise, stating, "As of the date of this Memorandum, the Partnership has not identified or acquired any Portfolio Securities."  This representation was false.  Not only had Haarman and Duke already identified the investment asset, but they had already negotiated the purchase price and ultimately signed an agreement to purchase the assets on December 20, 2015—*eight days before the date on the PPM*.  The signed contract obligated Angelus or its assigns

---

[2] As discussed in Section III.C.iv., below, Haarman and Duke partially disclosed some of these payments during an audit in conjunction with the sale of certain Fund assets.  This partial disclosure, however, occurred more than a year after the respective transactions.

to pay only $9.75 million, an amount well below the proposed $12 million capital raise.   On January 11, 2016, they consummated the transaction and transferred the Company A assets to the Fund.

33.     Instead of passing the lower purchase price on to the Fund or even disclosing this significant change in the purchase price, Haarman and Duke conspired to keep the difference for themselves thereby defrauding the Fund and its investors.  On January 14, 2016, Haarman and Duke transferred $731,875 to Duke,[3] $731,675 to Haarman, and $200,000 to their company, Angelus, leaving a $200 balance.

34.     Haarman and Duke characterize their $1,663,550 payday as a combination of $663,550 in "acquisition fees" and a $1 million "bonus," purportedly earned for negotiating the sale price down from the initial asking price of $11.75 million, including a last-minute $1 million reduction just before closing.

35.     In August 2016, Haarman and Duke posted the first of several intermittent investor updates on Angelus's website.  It stated, "[a]s you know, we closed on our initial acquisition in January with a $12 Million purchase from [Company A]."  This statement was false because the purchase price was actually $9.75 million, and it failed to disclose that Haarman and Duke pocketed more than $1.6 million of the Fund's money.

       b.      *Company B Transactions*

36.     Defendants continued their fraudulent scheme with the Fund's subsequent investments.  On behalf of the Fund, Haarman and Duke negotiated the Fund's acquisition of oil-and-gas interests from Company B in two separate transactions; the first closing in June 2016 ("June 2016 Purchase") and the second in August 2016 ("August 2016 Purchase").  In the June

---

[3] Duke received $440,515 of this money directly.  He directed the remaining $291,360 to a third party to purchase a yacht.

2016 Purchase, the Fund paid $1,468,519.12 for certain oil-and-gas interests.  At the close of the June 2016 Purchase, Company B paid $100,000 each to Haarman and Duke.  The Purchase and Sale Agreement for the June 2016 Purchase was silent as to any basis for the two $100,000 payments.  Further, Haarman and Duke did not disclose these $100,000 payments to the Fund or its investors.

37.     In the August 2016 Purchase, the Fund paid Company B $688,890.62 for certain other oil-and-gas interests.  At the close of the August 2016 Purchase, Company B paid $50,000 each to Haarman and Duke.  The Purchase and Sale Agreement for the August 2016 Purchase included an exhibit purporting to be a separate agreement between the Fund and Company B for "consulting" services ("Company B Consulting Agreement").[4]  The Company B Consulting Agreement required Company B to pay "a consulting fee" in the amount of $50,000 to each Haarman and Duke, who supposedly represented the interests of the Fund.  Haarman and Duke did not disclose these $100,000 payments to the investors.  As a result of their conduct vis-à-vis these two Company B transactions, Haarman and Duke defrauded the Fund and its investors through their receipt of $300,000 from Company B, which represented 13.9% of the Fund's total acquisition costs from the June 2016 Purchase and August 2016 Purchase.

38.     Haarman and Duke later determined that Company B owed the Fund unpaid revenue distributions from oil-and-gas interests that the Fund purchased from Company B.  As a result, Haarman and Duke initiated an arbitration proceeding against Company B.  In conjunction with the arbitration, Haarman and Duke notified Company B that the Fund would not go forward with a contemplated additional purchase from Company B unless Company B paid the Fund $90,000 as a "make good payment for the 30 days of lost revenue [related to] the two wells we've

---

[4] No such agreement accompanied the June 2016 Purchase agreement.

recently bought from you," according to Duke.  After initially disputing the demand, Company B eventually paid the $90,000 in October 2016.  However, the Fund did not receive the payment. Even though the $90,000 represented lost revenues to the Fund, Haarman and Duke pocketed the payment, receiving it in an account they jointly owned and without disclosing it to the Fund or its investors.

        c.     *Company C Transaction*

39.     On behalf of the Fund, Haarman and Duke signed an agreement on June 27, 2016, to purchase oil-and-gas assets from Company C for $610,000.  On July 15, 2016, on behalf of the Fund, Haarman and Duke entered a separate consulting agreement with Company C ("Company C Consulting Agreement").  The Company C Consulting Agreement provided that, out of the $610,000 purchase proceeds, Company C would pay "a consulting fee" of $50,000 to each Haarman and Duke, who supposedly represented the interests of the Fund.  But Company C never actually paid its consulting fee to Haarman and Duke.  In actuality, Haarman and Duke simply paid themselves the fee from a Fund account.  Haarman and Duke did not disclose to the Fund or its investors these $50,000 payments—which represented 16.4% of the Fund's acquisition costs.

        d.     *Company D Transaction*

40.     On behalf of the Fund, Haarman and Duke signed an agreement dated June 30, 2016, to purchase oil-and-gas assets from Company D for $15,000,000.  The closing was delayed until October 2016, so that the Fund could finalize a $12,500,000 loan from a bank to finance the purchase.[5]  In connection with the purchase from Company D, Haarman and Duke had the Fund pay Angelus, their co-owned company, $500,000, which Haarman and Duke characterized as an "acquisition fee."  However, they failed to disclose this fee to the Fund or its investors.

---

[5]  Because of the delay, the Fund paid Company D a $50,000 late fee above the purchase price.

41.     Further, after taking out the bank loan, Haarman and Duke caused the Fund to violate the terms of the loan agreement.  Under the loan agreement, the bank included requirements that the Fund (1) make principal-drawdown payments of $275,000 per month from December 2016 through May 2017; (2) maintain all of its business, cash management, operating, and administrative accounts at the bank, and grant the bank a lien on these accounts; and (3) cease all dividend or distribution payments to investors.  Despite these terms, Haarman and Duke deposited only enough money into the bank accounts to cover the Fund's monthly payment obligation and held significant Fund assets in an account at a second bank.  From this other account, they paid investor distributions totaling $1,324,186.03, in violation of the loan terms.  The loan is currently in default, and the Fund's assets are insufficient to pay off the almost $7.7 million loan balance.

42.     In November 2016, Haarman and Duke posted an update on Angelus's website concerning the Company D purchase.  In this update, they claimed that the bank has

> forced us to escrow 100% of the portfolio's net revenues for the next two-quarters, preventing us from being able to make our regularly scheduled distributions to investors for those two quarters. However, we are confident that that requirement will be lifted, or at least partially so, at the next bank redetermination.  The upside is that those funds will be sitting there safe and sound ready to be distributed afterwards.

43.     This statement was false and misleading: the bank-loan terms contained no such escrow requirement; not all the Fund's net revenues were being held at the bank; and there was no assurance that funds would be available when distributions commenced.  Moreover, the loan terms provided for a prohibition on dividends and distributions until full payment and performance of all obligations under the loan documents and termination of the commitment.  Therefore, Haarman and Duke had no reasonable basis to imply that the distribution ban would lift after the next two quarters.

  *iv.* ***Defendants Only Partially Disclosed the Payments They Received Two Years
Earlier***

  44. In the fourth quarter of 2018, Haarman and Duke posted on the Angelus website
the Fund's audited financial statements for 2016 and 2017.  An independent CPA firm conducted
the audit, which was necessary in order to verify the Fund's assets when APEG entered into a
Letter of Intent for the sale of those assets.  During the audit, Haarman and Duke disclosed to the
auditor most of the fees they received in 2016, including the $1 million payment they split in the
Company A transaction.  But, they did not disclose that they received the payment as "consulting
fees," "acquisition fees," or a "bonus."  Instead, in a footnote describing the related-party
transactions, the financial statements stated, "The Partnership incurred brokerage fees for each of
the asset purchases completed during 2016, which consisted of customary brokerage and
professional fees paid.  During 2016, the [Fund] paid $2,363,550 in such fees to related parties."
The stated amount, $2,363,550, omitted the $200,000 that Haarman and Duke split in the first
Company B transaction and the $90,000 arbitration settlement payment paid by Company B.  This
partial and belated disclosure, however, came more than a year after Haarman and Duke's last
acquisition-fee payment, long after investors could have used the information in making an
investment decision concerning whether to invest in the Fund.

**D.** **APEG, Haarman, and Duke Served as the Fund's Investment Advisers**

  45. At all relevant times, each of the Defendants owed the Fund fiduciary duties as a
result of Defendants' service as the Fund's investment advisers.  Under Haarman and Duke's
direction, APEG advised the Fund as to the value of, and the advisability of investing in, "Portfolio
Securities."  The PPM defined this term to include, "without limitation, stocks, bonds, debt,
options, commodities and derivatives."  As the Fund's general partner, APEG had sole and
absolute discretion to invest—*or not to invest*—in certain Portfolio Securities.  Stated differently,

APEG had the sole and absolute discretion to invest in securities, but ultimately elected instead to invest in the various acquisitions including those described in Section V.C.iii., above.

46.     Defendants were compensated for their advisory services.   APEG received an annual management fee equaling 2% of the fund's asset value.   From 2016 through 2017, the Fund paid APEG management fees totaling $724,560.   Haarman and Duke were also compensated for their advisory services.   The Fund paid—unbeknownst to the investors—$2.7 million to Haarman and Duke for their purported services to the Fund.

47.     Defendants breached their fiduciary duties to the Fund.   Defendants failed to exercise the requisite utmost good faith and fair dealing with the Fund, to disclose to the Fund all material facts, and to employ reasonable care to avoid misleading the Fund.   They failed to eliminate, or at least fully and fairly disclose, the clear conflicts of interest in designing and negotiating the agreements with Company A, Company B, Company C, and Company D discussed in Section V.C.iii., above, through which Haarman and Duke surreptitiously paid themselves nearly $2.7 million in purported acquisition fees, consulting fees, and bonuses.   They effectively siphoned off the Fund's capital by causing the Fund to overpay for its investments in an effort to pay themselves whatever they wanted.   These funds were above and beyond the 2% management fees represented in the PPM and agreed to by the Fund investors.

## VI.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule
10b-5 thereunder [17 C.F.R. § 240.10b-5]**

*Against All Defendants*

48.     Plaintiff re-alleges and incorporates paragraphs 1, 2, 4, and 6-44 of this Complaint by reference as if set forth verbatim in this Claim.

49.     As further detailed above, Defendants made various material misrepresentations and omissions in the Fund offering materials regarding the Fund's initial acquisitions, Duke's background in the oil-and-gas industry, and the amounts investors would pay to APEG for its services as the Fund's general partner.  Defendants also defrauded the investors by secretly paying Haarman and Duke undisclosed fees generated from the Fund's transactions with Company A, Company B, Company C, and Company D, as well as funds from the arbitration settlement with Company B.  In addition, Haarman made false representations to investors regarding the risks and rewards of investing in the Fund.

50.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of any facility of any national securities exchange, knowingly or with severe recklessness:

     a.   employed devices, schemes, and artifices to defraud; and/or

     b.   made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     c.   engaged in acts, practices, and courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

51.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q]

#### *Against All Defendants*

52.     Plaintiff re-alleges and incorporates paragraphs 1, 2, 4, and 6-44 of this Complaint by reference as if set forth verbatim in this Claim.

53.     As further detailed above, Defendants made various material misrepresentations and omissions in the Fund offering materials regarding the Fund's initial acquisitions, Duke's background in the oil-and-gas industry, and the amounts investors would pay to APEG for its services as the Fund's general partner.  Defendants also defrauded the investors by secretly paying Haarman and Duke undisclosed fees generated from the Fund's transactions with Company A, Company B, Company C, and Company D, as well as funds from the arbitration settlement with Company B.  In addition, Haarman made false representations to investors regarding the risks and rewards of investing in the Fund.

54.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, have:

   a.   knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

   b.   knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     c.   knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

55.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)]**

*Against All Defendants*

56.    Plaintiff re-alleges and incorporates paragraphs 1, 3, 4, 6-25, and 31-47 of this Complaint by reference as if set forth verbatim in this Claim.

57.    As alleged above, APEG, Haarman, and Duke each had an adviser-client relationship with, and therefore owed a fiduciary duty to, the Fund, pursuant to Sections 206(1) and 206(2) of the Advisers Act. The fiduciary standard for investment advisers includes the obligations to exercise the utmost good faith in dealing with their clients, to disclose to their clients all material facts, and to employ reasonable care to avoid misleading their clients. An investment adviser's fiduciary duties include a duty to "to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 191-92 (1963). An investment adviser's failure to disclose material information constitutes "fraud or deceit" under the Advisers Act. *Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2004) (citing *Capital Gains*, 375 U.S. at 201).

58.    Defendants breached their fiduciary duties by carrying out their self-dealing in the form of undisclosed acquisition and consulting fees of nearly $2.7 million taken from the Fund's

business dealings with Company A, Company B, Company C, and Company D. These funds were above and beyond the 2% management fees represented in the PPM and agreed to by the Fund investors. At all relevant times, Haarman and Duke acted knowingly or with severe recklessness when carrying out this fraud, and their state of mind is imputed to APEG, which they controlled.

59.    By engaging in the conduct described above, APEG, Duke, and Haarman, directly or indirectly, by use of the mails or means of instrumentalities of interstate commerce:  (a) knowingly or with severe recklessness employed devices, schemes or artifices to defraud clients or prospective clients, and (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

60.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1.    Permanently enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)];

2.    Ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged herein, plus prejudgment interest on those amounts;

3.    Imposing civil penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] for violations of the federal

securities laws as alleged herein; and

    4.      Imposing such other and further relief as the Commission may show itself entitled.


Dated:  March 11, 2021            Respectfully submitted,

                              */s/ Jason P. Reisnsch*
                              Jason P. Reinsch
                              Texas Bar No. 24040120
                              Jaime Lynn Turner    *pro hac vice pending*
                              New Jersey Bar No. 020372008
                              United States Securities and Exchange Commission
                              Fort Worth Regional Office
                              801 Cherry Street, Suite 1900
                              Fort Worth, Texas 76102
                              (817) 900-2601 (phone)
                              (817) 978-4927 (facsimile)
                              reinschj@SEC.gov
                              turnerja@sec.gov

                              ATTORNEY FOR PLAINTIFF SECURITIES
                              AND EXCHANGE COMMISSION