# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **SECURITIES & EXCHANGE COMMISSION,** *Plaintiff* | § § § § | |
| | § | **No.  A-21-CV-00235-LY** |
| **v.** | § § | |
| **PAUL W HAARMAN, PATRICK E DUKE,  APEG ENERGY GP, LLC,** *Defendants* | § § § § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

Before the Court is Defendants' Motion to Dismiss, Dkt. 15, and all related briefing. After reviewing these filings and the relevant case law, the undersigned issues the following report and recommendation.

## I.       BACKGROUND

This is a securities fraud case. On January 1, 2016, Defendants Paul Haarman and Patrick Duke formed APEG Energy, LP, (the Fund), which was focused on investments in the oil and gas industry. The Fund was formed as an investment opportunity offered by Angelus Private Equity Group, LLC (APEG), an investment management firm wholly co-owned by Haarman and Duke.

The stated purpose of the Fund was to "engage solely in the business of acquiring, owning, holding and disposing of investments in the energy sector, as may be identified from time to time by [APEG]." The Fund sought to realize an aggregate

1

of 25% annualized returns for investors over the course of three to four years. From December 2015 through October 2016, Haarman and Duke raised approximately $17.4 million from 115 investors to capitalize the Fund.

Haarman and Duke co-managed the Fund as the sole managers of APEG, which served as the Fund's general partner. Angelus Capital wholly owns APEG. Angelus Capital is, in turn, a wholly owned subsidiary of Angelus. Haarman and Duke, in turn, each own 50% of Angelus through two companies: one wholly owned by Haarman and one wholly owned by Duke.

The Securities and Exchange Commission included an illustrative chart in its Complaint, which the Court finds helpful to explain the relationship of the entities involved.



Dkt. 1, at 3.

The SEC alleges that "through a series of misrepresentations and omissions, a deceptive scheme, and disregard of the fiduciary duty" they owed to the Fund, the Defendants violated the antifraud provisions of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, the Securities Exchange Act of 1934,15 U.S.C. § 78a, *et seq.*, and the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1, *et seq. Id.*, at 1.

Defendants now move to dismiss those claims arguing that: (1) the Adviser's Act claim fails as  a  matter of law because Defendants did not function as "advisers"; (2) the SEC has failed to adequately plead a violation of 10b-5 or 17(a) because, (a) the SEC failed to plead the misleading statement made by Haarman with particularity as required by Rule 9(b), (b) the statements set forth in Duke's biographical summary are truthful, and therefore cannot be the basis of a 10b-5 or 17(a) claim, and (c) payments of fees to "affiliates" were adequately disclosed to investors in the Fund's Private Placement Memorandum (PPM), Limited Partnership Agreement (LPA), and audited financial statements. Dkt. 15.

## II.      LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid*

*Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at

338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

For claims of fraud, the pleading standard is heightened. Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b)'s particularity requirement generally means that the pleader must set forth the "who, what, when, where, and how" of the fraud alleged. *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005). A plaintiff pleading fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564-65 (5th Cir. 2002). Rule 9(b) seeks to "provide[ ] defendants with fair notice of the plaintiffs' claims, protect[ ] defendants from harm to their reputation and goodwill, reduce[ ] the number of strike suits, and prevent[ ] plaintiffs from filing baseless claims." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)). Courts are to read Rule 9(b)'s heightened pleading requirement in conjunction with Rule 8(a)'s insistence on simple, concise, and direct allegations. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).

# III.     DISCUSSION

## A.     The SEC's Claim Under Section 206(1) and (2) of the Investment Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2)

Defendants first move to dismiss the SEC's claim that APEG, Haarman, and Duke each had an adviser-client relationship with the Fund, and therefore owed the Fund a fiduciary duty pursuant to Sections 206(1) and (2) of the Advisers Act. The SEC maintains that Defendants violated their duties, including those to eliminate and expose all conflicts of interest and to disclose material information to their clients, when they paid themselves undisclosed acquisition and consulting fees of $2.7 million, which the SEC asserts were beyond the 2% management fees represented in the PPM and agreed to by the Fund investors.

Defendants maintain that this claim fails as a matter of law because they do not qualify as "investment advisers" under the Act because the Fund did not invest in "securities". The SEC responds that it has stated a claim that APEG, Haarman and Duke served as "investment advisers" pursuant to the Advisers Act, 15 U.S.C. § 80b-2(a)(11), managing and investing funds on behalf of others, and that the Fund's ultimate investments are irrelevant.

The Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities .... " 15 U.S.C. § 80b-2(a)(11).

Defendants' main argument in that the SEC "admits that the Fund never invested in any securities, only oil and gas assets." Dkt. 15, at 2. Defendants rely on the statement in the Complaint that "Haarman and Duke ultimately decided not to invest in stocks or other enumerated Portfolio Securities, and instead selected oil-and-gas assets." Dkt. 1, at 7. Defendants argue that "since none of the Defendants engaged in advising the Fund as to the purchase or sale of securities, the Section 206 claim fails as a matter of law." Dkt. 15, at 2. The undersigned finds this argument is without merit.

The PPM states that, "The partnership was formed for the purpose of investing in various opportunities in the energy sector identified by the General Partner from time to time, in its sole discretion, which opportunities may include, without limitation, stocks, bonds, debt, options, commodities, and derivative, (each such opportunity a "Portfolio Security"). Dkt. 15-3, at 17. However, in its Complaint, the SEC pleads that, "This case involves the offer and sale of limited partnership interests, which are investment contracts, and thus securities under Section 2(a)(1) of the Securities Act, [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [5 U.S.C. § 78c].

Investors invested in or "subscribed to" the APEG Energy limited partnership, and the Defendants then invested those monies in whatever investment they deemed appropriate. The definition of "Portfolio Security" in the PPM is not controlling.[1]  The

---

[1] The undersigned notes that the LPA expressly states that "the Subscriber understands that the interests will be 'restricted securities' ...." Dkt. 15-2, at 5. Additionally the PPM is replete with references to "securities" stating that "these securities have not been registered with the SEC under the Securities Act of 1933," *id.*, at 4, "there is no public or other market for

Complaint pleads that the limited partnership interests are the "securities" in issue. Regardless of whether or not the Defendants purchased "Portfolio Securities" as defined in the PPM, the SEC has stated a securities claim.

Additionally, the undersigned finds that Defendants qualify as "investment advisers" regardless of APEG Energy, LP's ultimate investments. *See Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.,* 916 F.3d 528, 535 (5th Cir. 2019) (finding that "investment advisers" need not specifically advise their clients to invest in securities to qualify). Moreover, the PPM describes "Portfolio Securities" as "without limitation" to the enumerated list. Thus, oil and gas assets arguably qualify as "securities" pursuant to the nonexclusive language of the PPM.

Additionally, APEG had sole and absolute discretion with respect to which Portfolio Securities the Fund invested in. Dkt. 1, at 7, 16-17.  APEG exercised this discretion and invested the Fund's capital in no less than five specific transactions with Companies A-D over the course of eleven months. *Id.*, at 11.  For these investment services, the Defendants were compensated with an annual fee of 2% of the Fund's asset value. *Id.,* at 7-8, 16-17. The parties do not dispute Defendants advised their clients on investments and were compensated for that advice. Haarman and Duke shared control over APEG as its sole managers and owners, were responsible for its decision making, and shared responsibility for identifying and acquiring assets on the Fund's behalf. *Id.*, at 6-7, 16. A person who owns and manages

---

these securities," *id.*, at 5, "Investors must expect to retain ownership of the securities," *id.*, the Agreement  ... contains restrictions on transfer and resale of the securities offered," *id.* The PPM additionally contained "notice requirements" for various states most beginning "these securities or the "securities offered." *Id.*, at 7-16.

the funds of an investment adviser company and is compensated by the investment adviser company by a salary or a percentage of net profits or capital gains is considered an investment adviser for the purposes of Section 206. *See United States v. Miller*, 833 F.3d 274, 282 (3d Cir. 2016); *United States v. Onsa*, 523 F. App'x 63, 64-65 (2d Cir. 2013) (unpublished); *Goldstein v. S.E.C.*, 451 F.3d 873, 876 (D.C. Cir. 2006); *United States v. Elliott*, 62 F.3d 1304, 1310-11 (11th Cir. 1995), opinion amended by 82 F.3d 989 (11th Cir. 1996); *Abrahamson v. Fleschner*, 568 F.2d 862, 870-71 (2d Cir. 1977). APEG, Duke, and Haarman all qualify as "investment advisers," under the statute, and the SEC has adequately pled its claims.

## B. Whether the SEC has adequately pled a violation of 10b-5 or 17(a)

The SEC has alleged that Defendants violated Section 17(a) of the Securities and Exchange Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Dkt. 1, at 3. Defendants argue that the SEC has failed to plead plausible 10b-5 or 17(a) violations, and therefore these claims should be dismissed.

To establish liability under Rule 10b-5, the SEC must prove that a defendant made "an untrue statement of material fact or omit[ted] a material fact" and did so with an "'intent to deceive, manipulate or defraud'" or "'severe recklessness'" such that the "'danger of misleading buyers or sellers ... is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Sec. & Exch. Comm'n v. Blackburn*, 15 F.4th 676, 681 n.3 (5th Cir. 2021) (citing S*outhland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)) (citation omitted). A

9

misrepresentation or omission "is material 'if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest.'" *SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018) (quoting *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002)). The scienter element for § 10(b) and Rule 10b-5 requires "an intent to deceive, manipulate or defraud, and includes severe recklessness." *SEC v. Seghers*, 298 F. App'x 319, 333 (5th Cir. 2008) (per curiam).

"To show a violation of § 17(a)[ ], the Commission must prove: (1) material misrepresentations or materially misleading omissions; (2) in the offer or sale of securities; (3) made with scienter." *Id.* at 327. The scienter element for § 17(a)(1) is the same as for § 10(b) and Rule 10b-5, which "embraces an intent to deceive, manipulate or defraud, and includes severe recklessness." *Id.* at 333. To prove a violation of § 17(a)(2) or § 17(a)(3), the SEC must prove the first two elements, but "need only show that the defendant acted with negligence." *Id.*

> 1.   Whether the SEC failed to plead the misleading statement made by Haarman with particularity as required by Rule 9(b)

In its Complaint, the SEC alleges that beginning in December 2015, Haarman began soliciting subscribers to his "financial literacy" website, Shift Evolution, describing the Fund and its expected success in investing in oil and gas assets. Dkt. 1, at 8.  At the time Haarman was sending emails soliciting investors, Haarman and Duke were negotiating the purchase of multiple oil and gas assets from "Company A," an unaffiliated public company that was preparing to file for bankruptcy. The

SEC identifies the following statements made in emails which it asserts were false and misleading and the reasons it asserts the statements were fraudulent:

| HAARMAN'S STATEMENTS | REALITY |
|---|---|
| The "production of these wells are hedged from day one" against any future decline in oil prices, and "[t]here is ZERO possibility of anyone losing their principle on account of all of the safety measures we have in place.  And that is what guarantees that the production revenue will never decline regardless of what happens in the market." | No measures were in place to prevent principal loss or otherwise to guarantee production revenue. |
| "[D]on't be stupid!  You are looking at a gift horse in the mouth right now.  You have a GUARANTEED return of 25% staring at you right now. . . . I promise you that you will make a ton of money." | No measures were in place to prevent principal loss or otherwise to guarantee production revenue. |
| This "deal will provide a steady very steady return that will hit the 25% for the entire duration."  "If it were me, I would put everything I have available [into it]." | Haarman had no reasonable basis to project steady returns of 25% given that he and Duke had yet to identify and/or purchase all of the assets for the Partnership.  Notably, Haarman never invested his own money in the Fund. |
| "We [as] a company, along with our operating partners, make NO money until after you have made a cumulative total of 25% of your funds during the time period your money has been invested." | In addition to 2% management fees, Haarman and Duke received $1,663,500 from the investment proceeds in connection with the Fund's first asset acquisition.  In later acquisitions, they received payments totaling $990,000, even though the Fund had not (and still has not) returned investors' initial investment. |

Dkt. 1, at 9. Defendants maintain that the statements identified above by the SEC were "cherry-picked" and improperly edited, as they were sent to individual investors in the context of ongoing communications. Defendants argue that the heightened pleading standard of Rule 9(b) applies, and the SEC's pleading lacks the detail required for a fraud claim including: to whom the email statements were made; when the statements were made; the relationship of Haarman to the parties; and the context of the statements. Additionally, Defendants complain that the SEC asserts that Haarman made misleading statement "during phone calls" while identifying no instance of a phone call where a misleading statement was made. Dkt. 15, at 13.

The heightened pleading standard of Rule 9(b) applies to securities fraud claims, and a plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent" to survive a motion to dismiss. *Tchuruk*, 291 at 350; *Williams,* 112 F.3d at 177 (stating Fed. R. Civ. P. 9(b) applies to securities fraud).[2]

The demanded particularity depends on the facts of each case. *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n. 6 (5th Cir.2000); *Williams,* 112 F.3d at 178 (emphasizing that the ultimate meaning of Rule 9(b) is context-specific).

> The sufficiency of pleadings under Rule 9(b) may depend "upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading." Similarly, it has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied.

*U.S. ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998) (quoting *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957)). When the complaint details the defendants' scheme and apprises them of the basic transaction(s) upon which

---

[2] Defendants have attached evidence to their Motion to Dismiss, including printouts of the emails containing the statements identified by the SEC as fraudulent. Defendants argue that the undersigned may consider this evidence because it is referenced in the Complaint. The SEC objects to the inclusion of this evidence asserting that a court's assessment of a motion to dismiss is limited to the pleadings, and consideration of the emails would convert Defendants' motion to a motion for summary judgment. The undersigned finds that it may properly consider Defendants' attachments, as they are referred to in the Complaint and "central to the SEC's claims". However, consideration of the attached evidence does little to further Defendants' position, as in the case of the attached emails, it simply bolsters the SEC's claims. Additionally, the undesigned cannot consider disputed issues of fact in the context of a motion to dismiss, and must assume that the SEC's pleadings are true.

fraud is alleged, an enforcement action may be less specific with respect to when and where the alleged fraud occurred. *See SEC v. Sharp Capital, Inc.*, No. 3:98-CV-2792-G, 1999 WL 242691, at *2 (N.D. Tex. Apr. 16, 1999). Moreover, Rule 9(b) does not require plaintiffs who allege "a long-running scheme involving many false claims 'to list every false claim, its dates, [and] the individuals responsible.'" *U.S. ex rel. Hebert v. Dizney*, 295 Fed. App'x 717, 723 (5th Cir. 2008) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998)).

The undersigned finds that the SEC had adequately pled its fraud claim regarding Haarman's emails. It has identified Haarman as the person who made misrepresentations. It has identified the alleged misrepresentations Haarman made via email to potential investors[3] in the Fund, including guarantees that the investment in the Fund was no risk, that the investments were hedged against future declines in oil prices, and about Defendants' fees, which it has identified as false or misleading. The SEC has pled the period the fraud occurred, from December 2015 to October 2016. The SEC has also pled where the fraud occurred and the instrumentality of the fraud. The Undersigned finds that the SEC's pleading with regard to Haarman's emails is adequate to meet the particularity requirements of Rule 9(b) and notify Defendants of the SEC's claims against them in an enforcement action, such as this. *See Sharp Capital, Inc.*, 1999 WL 242691, at *1-2 (holding the SEC's complaint pled fraud with sufficient particularity to put the defendant on

---

[3] Defendants argue that that the Complaint erroneously suggest that Haarman made misleading statements to "all investors," Dkt. 22, at 2, but the undersigned's reading of the Complaint finds that it merely states that Haarman emailed "investors" which could accommodate two or many more, but not necessarily "all".

notice of the claims against it). However, the undersigned does find that the SEC has failed to plead any specific instances of Haarman making misrepresentations over the telephone. Accordingly, any claims of fraud conducted via telephone should be dismissed without prejudice, and the SEC should be allowed to replead.

>    2.    Whether the statements set forth in Duke's biographical summary are truthful, and therefore cannot be the basis of a 10b-5 or 17(a) claim

The SEC asserts that the PPM included materially misleading statements about Duke's background and experience. Duke drafted his own background stating in relevant part:

> [Duke] is also the founder, President and Managing Director of Duke Capital Management, a private boutique investment banking firm based in Houston, Texas. Prior to founding Duke Capital Management, Patrick worked for the Texas Railroad Commission which is the Oil and Gas regulatory Agency for the State. Patrick paid for his college studies by working on Oil and Gas rigs both on and offshore. Patrick has been involved in over $150,000,000 in Oil and Gas transactions, predominately onshore. Along with two others, Patrick built an oil and gas exploration company that sold to Placid Oil Company which is owned by the Hunt Family in Dallas, Texas.

Dkt. 1, at 9-10.

The SEC asserts that Duke's biographical information was materially misleading. First, the SEC asserts that Duke worked at the Texas Railroad Commission as a part-time clerk while when was in high school, while his biography implied he worked there in a relevant oil and gas position just prior to establishing Duke Capital, which he formed in 2013. The SEC pleads that in fact he last worked at the TRC in 1982, 33 years earlier, and his position did not require any specialized training or knowledge.  Dkt. 1, at 10.

Second, the SEC pleads that Duke's claims that he was involved in $150,000,000.00 in oil and gas transactions and built an oil and gas exploration company were also misleading. The SEC pleads that these statements conveyed the impression that Duke had extensive experience and a successful career in the oil and gas industry, when in fact, his oil and gas experience all took place during a short period in the 1980's, involved no oil and gas exploration activity, and yielded little profit to Duke, as it was a "part-time deal, where you'd go out on the weekends and rework wells." *Id.*

Third, the SEC complains that Duke misleadingly touted his purported investment banking and oil and gas experience going back to the 1980s and failed to disclose that he had not worked in the oil and gas industry at all since the 1980s. Additionally, he failed to disclose he filed personal bankruptcy in 2005, seeking to discharge consumer debt ranging from $500,000.00 to $1,000,000.00. *Id.*

Defendants assert that the statements set out in Duke's PPM biographical statement "are truthful, and therefore cannot form the basis of a 10b-5 or 17(a) claim." Dkt 15, at 20. The SEC responds that literal truth is not a defense to a securities fraud case. The undersigned agrees. A statement can be misleading even if it is in the strictest sense truthful. Rule 10b-5 provides for that "an untrue statement of material fact or omit[ted] a material fact" is a basis for a cause of action. Similarly, an element of § 17(a) cause of action is material misrepresentations or materially misleading omissions. Thus, a defendant need not make an outright lie to be held liable under the relevant statutes but may lie by omission. "Accordingly, the

15

disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009).

Defendants further argue that the omissions and statements in issue are not materially misleading. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *cf. Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 203 (5th Cir. 1988) (noting that "emphasis and gloss can, in the right circumstances create liability" under Rule 10b-5).

As pointed out by the SEC, whether or not a statement or omission is material is a mixed question of law and fact. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). A court can determine statements to be immaterial as a matter of law on a motion to dismiss. *Tchuruk*, 291 F.3d at 359. However, it is well established that, "[b]ecause materiality is a mixed question of law and fact, it is usually left for the jury." *Id.* (quoting *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996)). "Materiality [is] appropriately resolved as a matter of law" when "reasonable minds cannot differ on the question." *TSC Indus.*, 426 U.S. at 450. In this case, the undersigned finds that reasonable minds could differ on the issue of whether Duke's omissions and misrepresentations were material, especially regarding his experience or lack thereof in the oil in gas industry.  This includes Duke's representations about

16

his work with the TRC as a teenager, which he presented as part of his relevant experience as an oil and gas entrepreneur, along with his presentation of his other alleged dealings in the oil and gas exploration milieu. *See Blackburn*, 15 F.4th at 676 (holding that failing to disclose that an individual with a criminal history had a key role in the company was material for purposes of a securities law violation because it "might have mattered to investors for a number of reasons, including but not limited to his criminal convictions, the lawsuit he settled for misappropriating over a million dollars from another company, or just his general reputation—good, bad, or nonexistent—in the oil-and-gas industry"). The issue of materiality necessarily involves delving into the facts of this case. The undersigned concludes that this issue is best decided by a jury.

The actual issue before the undersigned is whether the SEC has met the pleading requirements of 9(b) and stated a cause of action based on Duke's biographical statement. The undersigned finds it has.

### 3. Payments of fees to "affiliates"

The SEC next complains that from January 2016 to October 2016, Defendants purchased oil-and-gas assets for the Fund from four unaffiliated companies; and that instead of putting the interests of the Fund first, and in contrast to representations made in the PPM, Haarman and Duke misappropriated, or otherwise improperly diverted to themselves, nearly $2.7 million. This amount includes $2,563,550 in purported "consulting fees," "acquisition fees," and "bonuses." The SEC complains that neither the PPM nor the Partnership Agreement provided for such payments,

specifying only a 2% management fee to APEG. The SEC further alleges that Haarman and Duke misappropriated an additional $90,000, which represented an arbitration settlement with a  company the SEC identifies as "Company B." The SEC asserts that Defendants improperly failed to disclose these payments to the Fund or its investors when disclosing the asset transactions and engaged in self-dealing. Dkt. 1, at 11.

Defendants assert that the fees in issue were permitted and disclosed. Defendants argue that the PPM expressly authorizes the Fund's General Partner, APEG, to employ or engage affiliates over and above the 2% management fee and distributions, and further provides that the General Partner and its affiliates may receive fees and other compensation for services rendered in connection with its management of the partnership, and that these fees would not be determined through a competitive bidding process. Dkt. 15-3. Additionally, Defendants argue that Section 7.4(a) of the Fund's LPA requires that such transactions were only required to be disclosed on its annual audit and related statements. Defendants argue they did disclose these transactions, albeit belatedly and with the omission of an additional $290,000 in alleged related party fees. Defendants further assert that these disclosures in the related statements could not form the basis of a 10-b-5 or 17(a) claim because they could have not been considered by investors in connection with the sale of a security. *See SEC v. Mapp*, 240 F. Supp. 3d 569, 579-80 (E.D. Tex. 2017).

In its Complaint, the SEC pled that in the transaction with "Company A," Duke and Haarman sought to raise $12 million for the Fund, stating in the December 28,

2015, PPM "As of the date of this Memorandum, the Partnership has not identified or acquired any Portfolio Securities." Dkt. 1, at 11. Instead, Duke and Haarman had already negotiated and signed an agreement to purchase the assets for $9.75 million on December 20, 2015, which is eight days before the date on the PPM. The SEC pleads that instead of disclosing this purchase price, which was substantially lower than the capital raise, Haarman and Duke retained the difference thereby defrauding the Fund and its investors. On January 14, 2016, Duke received a transfer of $731,875, Haarman received a transfer of $731,675, and Angelus received a transfer of $200,000, leaving a $200 balance in the Fund. Further, Haarman and Duke posted on Angelus's website that "we closed on our initial acquisition in January with a $12 million purchase from [Company A]." The SEC asserts that this statement was false, as was the acquisition for $9.75 million. In the fourth quarter of 2018, after a required audit by an outside CPA, Haarman and Duke finally posted the Fund's audited financial statement for 2016 and 2017, which identified the amounts paid to them as "customary brokerage and professional fees." The SEC additionally complains that Defendants omitted an additional $290,000 in fees to Haarman and Duke, never disclosing those payments.

Defendants' arguments on this issue are without merit. First, they argue that they did not breach any duty because the Fund's LPA requires that any "affiliate" transaction was within the ambit of the Fund's PPM and only need be disclosed on its annual audit and related statements. However, the SEC pled that Defendants did not disclose these payments until 2018, and that the disclosure was not a full one,

failing to disclose who was paid the "customary brokerage and professional fees," and the additional $290,000, which are in conflict with the requirements of the LPA. Additionally, the SEC disputes whether these fees were in fact customary or qualified as "brokerage fees."

Moreover, reliance on the Fund's LPA and PPM to excuse the belated disclosure of the fees Haarman and Duke paid to themselves does not undermine the SEC's claims on this issue. Defendants argue that the omitted fee disclosure occurred well after anyone had invested in the Fund, and therefore could not qualify as "in connection with the purchase or sale of any security." Dkt. 15, at 25. The undersigned finds this argument specious, as the *omission* was made prior to sales of shares in the Fund, and therefore required investors to rely on the information available to them at the time, which was fundamentally lacking.

Defendants assert that "it is unclear why this additional [$290,000] (even assuming its accuracy) makes out a claim for securities fraud." Dkt. 15, at 19. The SEC is pleading fraud claims along with breach of Defendants' fiduciary obligations as investment advisers pursuant to Section 206(1) and (2) of the Adviser's Act, and these pleadings support those claims. Haarman represented to an investor that "We [as] a company, along with our operating partners, make NO money until after you have made a cumulative 25% of your funds during the time period your money has been invested." Dkt. 1, at 9. Even assuming the Fund's PPM and other documentation allows for payments to "affiliates,"[4] those payments can still constitute the basis for

---

[4] The undersigned notes that the PPM states that "The General Partner may choose to cause the Partnership to employ or engage affiliates of the General Partner, Angelus and/or the

fraud. The SEC has adequately pled its claims about Haarman and Duke's undisclosed payments to the Fund.

To the extent its pleadings are found wanting, the SEC moves to be afforded leave to amend. The undersigned finds this request is properly granted.

## IV.    RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Dismiss, Dkt. 15, **IN PART** with the one exception of the SEC's claims that Defendants committed fraud telephonically, which should be **DISMISSED WITHOUT PREJUDICE** as to repleading. The undersigned **FURTHER RECOMMENDS** that the SEC be allowed to replead its claim.

IT IS FURTHER ORDERED that this cause of action is REMOVED from the docket of the undersigned and RETURNED to the docket of the Honorable Lee Yeakel.

---

Principals to provide services to the Partnership at competitive market rates." Dkt. 15-3, at 18. The PPM further states under a Section denoted "Distributions and Compensation of the General Partner," "The partnership may engage affiliates of the General Partner, Angelus and/or the Principals to provide services to the Partnership; provided that the fees for such services shall be on arm's-length terms and at competitive market rates." *Id.*, at 30. Later, the PPM states under the heading "Fees for Services" that "The General Partner will, and its affiliates may, receive fees and other compensation for services rendered in connection with its management of the Partnership. The fees payable to the General Partner and its affiliates were not determined by competitive bidding or an arm's-length negotiation." *Id.*, at 40. These statements seem to be in conflict, underlining why Defendants' reliance on evidence outside the Complaint is unavailing.

## V.    WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).  A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 25, 2022.


_____
DUSTIN M. HOWELL
UNITED STATES MAGISTRATGE JUDGE