IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | | |
|---|---|---|
| Securities and Exchange Commission. | § § | |
| *Plaintiff*, | § § § | |
| v. | § § | No. 1:21-cv-235-DAE |
| Paul W. Haarman, Patrick E. Duke, and APEG Energy GP, LLC, | § § § § | |
| *Defendant*. | § § § | |

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
<u>PARTIAL MOTION FOR SUMMARY JUDGMENT</u>

Before the Court is Plaintiff Securities and Exchange Commission's,

("Plaintiff" or "SEC") Partial Motion for Summary Judgment[1], filed on August 16,

2024.  (Dkt. # 72).  Defendants Paul W. Haarman and APEG Energy GP, LLC

(collectively "Defendants")[2] timely filed a response to the SEC's Motion (Dkt.

# 77) and the SEC timely replied.  (Dkt. # 81.)

---

[1] The SEC moves for partial summary judgment on the issue of liability only.  If its motion is granted, the SEC has indicated that it will subsequently file a motion for remedies to address the relief sought.

[2] The Court notes that Defendant Patrick E. Duke appears to be proceeding Pro Se, after his attorney's Motion to Withdraw was granted, following his failure to respond to Counsel's calls or emails.  (Dkt. # 65.)  Further, Duke has failed to respond to the SEC's Motion.  However, because the Motion refers to Haarman,

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the parties' briefs and the relevant law, the Court: **GRANTS IN PART AND DENIES IN PART** the SEC's Partial Motion for Summary Judgment for the reasons that follow.  (Dkt. # 72.)

## BACKGROUND

On March 11, 2021, Plaintiff SEC filed this suit against Defendants Paul W. Haarman ("Haarman"), Patrick E. Duke ("Duke"), and APEG Energy GP, LLC ("APEG" or "APEG, LLC").  (Dkt. # 1.)  The SEC alleged that "through a series of misrepresentations and omissions, a deceptive scheme, and disregard of the fiduciary duty" they owed to the APEG Energy, LP investment fund, Haarman and Duke violated the antifraud provisions of the Securities Act of 1933, 15 U.S.C. § 77a, et seq. and the Securities Exchange Act of 1934,15 U.S.C. § 78a, et seq., as well as the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1, et seq.  (Id. at 1.)

On January 1, 2016, Defendants Haarman and Duke formed APEG Energy, LP (the "Fund"), as an investment opportunity offered under the umbrella of Angelus Private Equity Group, LLC ("Angelus"), a private-equity firm they jointly operated and co-owned.  (Dkt. # 40 at ¶¶ 14, 16.)  Angelus Capital, LLC ("Angelus Capital") is yet another entity operated and owned by Duke and

Duke, and APEG collectively as "the Defendants," without excluding Duke, the Court follows suit.

Haarman, that is wholly owned by Angelus and that in turn wholly owns Defendant APEG, LLC. (<u>See</u> Dkt. # 28 at 2.)   The Fund's stated purpose was to "engage solely in the business of acquiring, owning, holding and disposing of investments in the energy sector." (Dkt. # 40 at ¶ 16.) Defendants raised $17.4 million from 115 investors through the sale of limited partnership interests in the Fund. (Dkt. # 72 at 2.)

Defendants exercised complete control over the Fund. (<u>Id.</u>) Defendant APEG served as the general partner to the Fund, while 115 investors made up its limited partners. (Dkt. # 40 at ¶ 13.) Haarman and Duke had exclusive control over APEG and the Fund's investments, and each approved every prospective investment by the Fund prior to acquisition. (Dkt. # 72 at 2.)

Defendants began soliciting investments in the Fund in December 2015. (Dkt. # 72 at 3.) In the course of soliciting investors, Defendants provided prospective investors with the Fund's Private Placement Memorandum ("PPM"), which included an Agreement of Limited Partnership for the Fund ("Partnership Agreement") attached thereto. (<u>Id.</u>) Haarman and Duke contributed to, reviewed, and approved the PPM prior to its dissemination to investors. (<u>Id.</u>)

The Partnership Agreement defined potential investments in the energy sector as "Portfolio Securities," which included "without limitation, stocks, bonds, debt, options, commodities and derivatives." (<u>Id.</u> at 4.) The Partnership

Agreement vested General Partner APEG, and, by extension Haarman and Duke, with complete control over the Fund's management and operations, including the decisions regarding what investments the Fund would pursue.  (Id.)  When the Fund Offering began, Haarman and Duke had not yet committed to any particular investment, although they ultimately decided not to invest in stocks or other enumerated Portfolio Securities and instead selected solely oil-and-gas assets.  (Id.)

The PPM and Partnership Agreement stated that the investors would receive, based on the Fund's performance, certain annualized distributions, including a quarterly distribution equal to 10% of capital contributions and a final distribution upon liquidation equal to 15% of capital contributions.  (Id.)  The Partnership Agreement explicitly authorized a management fee, payable to Defendants, of 2% of the Fund's "asset value."  (Id.)  In 2016 and 2017, the Fund paid APEG management fees totaling more than $724,000.  (Id. at 4–5.)  Further, the Partnership Agreement included a provision for APEG, and therefore Duke and Haarman, to receive a distribution of 100% of the Fund's assets remaining after the Fund had returned all capital contributions, plus certain preferred distributions. (Id. at 5.)

The PPM also indicated that the Defendants would "use *one hundred percent* (100%) of the proceeds from the Offering, after payment of Partnership expenses, to identify, purchase, hold, and sell or otherwise dispose of Portfolio

4

Securities." (Id.) (emphasis added).  One APEG sales representative wrote in a January 2016 email to an investor that ""[APEG] does not make a dime until the investors are paid!" (Id.)

I.    Delayed and Incomplete Disclosure of Fees

From January 2016 to October 2016, Defendants purchased oil-and-gas assets for the Fund in five separate transactions from four unaffiliated companies: (1) Company A; (2) Company B; (3) Company C; and (4) Company D. (Id.)  During these transactions, Haarman and Duke received payments totaling $2,563,550, either directly or through their ownership in the various APEG/Angelus entities.  (Id.)

In January 2016, Defendants negotiated a purchase price of $9.75 million for Company A's assets, with Duke and Haarman concurrently receiving $663,550 in "acquisition fees" from the Fund, and an additional $1 million  later characterized as a "bonus." (Id. at 5–6.)  Duke and Haarman's umbrella company, Angelus, purchased the assets from Company A for $9.75 million, and subsequently "assigned" those assets to the Fund after receiving $10.75 million in exchange, resulting in the $1 million "bonus."  (Dkt. # 77 at 6.)  At the time of the transaction, Defendants did not disclose the $1,663,550 in acquisition fees and a "bonus" that they received to investors (limited partners) in the Fund.  (Dkt. # 72 at 8.)

In June 2016 and August 2016, the Fund acquired oil-and-gas assets from Company B. (Id. at 6.) During the June 2016 purchase, Haarman and Duke each received $100,000 from Company B, and the Purchase and Sale Agreement from that transaction is silent as to the basis for these two payments. (Id.) During the August 2016 transaction, an Amended Purchase and Sale Agreement was executed in which the Fund acquired Company B's assets for $577,343.75 and Company B, the counterparty to the Fund in the transaction, paid Haarman and Duke a "consulting" fee of $50,000 each, for a total of $100,000. (Dkt. # 72 at 6–7.) Haarman and Duke did not disclose these payments to the investors of the Fund at the time, nor did they disclose that they were simultaneously representing the Fund and providing consulting services to Company B. (Id. at 7.)

Similarly, in June and July 2016, Haarman and Duke signed agreements in which Company C sold oil-and-gas assets to the Fund for $610,000, and Company C agreed to pay a $50,000 consulting fee to both Haarman and Duke, for a total of $100,000, out of the proceeds from that sale. (Id.) However, Company C did not pay the $100,000 – instead, that amount was paid to Duke and Harmaan directly from the Fund bank account. (Id.) At the time of the transaction, Defendants did not disclose these fees to investors. (Id.)

Finally, in June 2016, Duke and Haarman signed an agreement for the Fund to purchase oil-and-gas assets from Company D for $15 million. (Id. at 8.)

In connection with this transaction, Angelus received a $500,000 "acquisition fee" that was not disclosed at the time to the investors in the Fund.  (Id.)

As noted above, Defendants did not contemporaneously disclose to investors in the Fund that they had made these payments to themselves.  Instead, in August 2017, over a year after the final transaction, Defendants retained an accounting firm ("the Auditor") to audit the Fund's financial statements as of December 31, 2016.  (Id.)  The Auditor's report was completed in December 2017 and disclosed all except for $200,000 of the above fees as "Related Party Transactions."  (Id.)  Defendants admit that they received $2,563,550 in fees, even though the Auditor's report disclosed only $2,363,550 in fees.  (Id.)

II.    Representations to Investors

A.    Use of Funds

The PPM specified that 100% of the proceeds from the Offering, after payment of Partnership Expenses, would be used for the Fund's investments in Portfolio Securities.  (Dkt. # 72 at 9.)  Further, Haarman and at least one APEG sales representative also told investors that Defendants would not make any money until the investors received their 25% investment returns.  (Dkt. # 72-17) ("[w]e us [sic] a company, along with our operating partners, make NO money until after you have made a cumulative total of 25% …."); Dkt. # 72-16 ("[APEG] does not make a dime until the investors are paid!").

B.    <u>Omission of Information from Duke's Biography</u>

The PPM featured a section detailing Haarman's and Duke's professional accomplishments.  (Dkt. # 72 at 9.)  Defendants provided detailed information regarding Duke's professional experience to convey that he "brings a wealth of diversified local and international financial, real estate, oil and gas and transactional experience to this investment venture."  (<u>Id.</u>)  However, Defendants omitted facts pertaining to Duke's tumultuous legal history relating to real estate investments, as discussed below.

First, Defendants, despite alluding to Duke's experience at Duke Capital Management and his expertise in real estate, failed to include that Duke and his company "Duke Capital Management" had been sued by an investor for securities fraud and breach of fiduciary duty.  <u>See</u> <u>Anderson, Trustee v. Duke Capital Management Real Estate Fund IV, LLC, et al.</u>, No. DC-12-010920-F (116th Judicial District Court, Dallas County, Texas, initially filed Jan. 30, 2012) (the "Duke Fraud Action").  In the Duke Fraud Action, the plaintiff alleged that Duke, *inter alia*, misappropriated the investor's funds and failed to disclose six previous lawsuits that yielded various judgments for, *inter alia,* creditor fraud and fraudulent transfer of property.  (Dkt. # 72 at 10.)  Duke ultimately settled the Duke Fraud Action for $6,000,000 in property.  (<u>Id.</u>)  Haarman claims that Duke also failed to disclose the Duke Fraud Action to him.  (<u>Id.</u> at 11.)

Second, despite advertising Duke's financial expertise, Defendants omitted that Duke filed for personal bankruptcy 10 years prior to the Fund offering. (Dkt. # 72 at 10.) Finally, Defendants represented that Duke "worked for the Texas Railroad Commission which is the Oil and Gas regulatory Agency for the State," despite the fact that Duke's time at the Commission was more than 35 years earlier, as a high school clerk. (Id. at 11.)

C.      Risks Associated with Investing in the Fund

Haarman made a series of representations in writing to investors regarding the risks associated with investing in the fund. For example, Haarman sent potential investors emails representing that the Fund was a guaranteed investment. See, e.g., Dkt # 72-13 ("[D]on't be stupid! You are looking at a gift horse in the mouth right now. You have a GUARANTEED return of 25% staring at you right now. . . . I promise you that you will make a ton of money."); Dkt. #72-17 ("There is ZERO possibility of anyone losing their principle on account of all of the safety measures we have in place. … That indirectly guarantees the 10% return you will be earning quarterly while your money is deployed."); Dkt. # 72 at 11 ("[This] deal will provide a steady very steady return that will hit the 25% for the entire duration." "If it were me, I would put everything I have available [into it]."). However, at the time of the Fund's offering, Haarman and Duke had not committed the Fund to any particular investment that would support these statements. (Id.)

9

To the contrary, at the conclusion of the Fund's existence, no investors recovered their initial capital contributions.  (Id.)

## LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.  See FED. R. CIV. P. 56(c); Lee v. Offshore Logistical & Transp., LLC, 859 F.3d 353, 355 (5th Cir. 2017) ("Although the substance or content of the evidence submitted to support or dispute a fact on

summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial.")  The court draws all reasonable inferences in the light most favorable to the nonmoving party.  Wease v. Ocwen Loan Servicing, LLC, 915 F.3d 987, 992 (5th Cir. 2019).  However, "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012).

DISCUSSION

I.      Antifraud Provisions

The SEC brings its antifraud claims under Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 249.10b-5.  Section 17(a) of the Securities Act prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security.

A defendant violates these antifraud provisions if the SEC establishes by a preponderance of the evidence that: (1) the defendant made a material misrepresentation or omission of material fact or employed a fraudulent scheme or engaged in an act that operated as a fraud; (2) the defendant acted with the required mental state; (3) in connection with the purchase, offer, or sale of any security; and

(4) the defendant used or caused the use of interstate commerce. <u>SEC v. Gann</u>, 565 F.3d 932, 936 (5th Cir. 2009). Violations of the antifraud provisions of the Securities Act and Exchange Act are routinely analyzed together. <u>SEC v. Spence & Green Chem. Co</u>., 612 F.2d 896, 903 (5th Cir. 1980).

The SEC argues Defendants have violated the antifraud provisions both through material misrepresentations or omissions of material facts and through a fraudulent scheme or acts that operated as fraud. The Court analyzes each type of claim in turn.

A.    <u>Material Misrepresentations or Omissions of Material Fact</u>

1.    <u>Materiality</u>

Materiality may be "resolved as a matter of law by summary judgment" when information is "so obviously important to an investor that reasonable minds cannot differ on the question of materiality." <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 405 (1976); <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 232 (1988) (adopting the <u>TSC Industries</u> standard of materiality for the § 10(b) and Rule 10b-5 context). "A fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]." <u>Southland Securities Corp. v. INSpire Ins. Solutions, Inc</u>., 365 F.3d 353, 362 (5th Cir. 2002) (internal quotation marks omitted).

Here, the SEC presented undisputed evidence that Defendants made misrepresentations or omissions about information that is obviously important to investors, including: (1) the fees paid to Defendants in association with the Fund; (2) Duke's background and experience; and (3) the risks associated with investing in the Fund.  However, as discussed below, the Court finds that there is a genuine dispute of material fact as to the materiality of the third category, risks associated with investing in the fund, precluding summary judgment on that issue.

First, Haarman falsely told at least one investor that APEG, as the general partner, would not make any money until the investors received their 25% investment return.  Additionally, the PPM specified that 100% of the proceeds from the Fund, after payment of Partnership Expenses, would be used for the Fund's Investment in Portfolio Securities.  It is undisputed that Haarman and Duke paid themselves, including through their ownership in their Angelus/APEG entities, more than $2.5 million in various fees.  It is further undisputed that these payments began as early as January 2016, prior to any "final distribution upon liquidation," as outlined in the PPM.  (See Dkt. # 72 at 4.)  In fact, far from receiving a 25% investment return, not a single investor, at the conclusion of the Fund's existence, recovered their initial capital contribution.

Any reasonable investor would want to know the commission arrangement of the organizers of an investment fund seeking his or her

contribution.  See S.E.C. v. Helms, 2015 WL 5010298, at *15 (W.D. Tex. Aug. 21, 2015) (finding misrepresentations regarding sellers' compensation material); Kaufman & Enzer Joint Venture v. Dedman, 680F. Supp. 805, 812 (W.D. La. 1987) ("commission arrangement" was material).  Accordingly, the Court finds that Defendants' misrepresentations regarding the fees they were to receive for their involvement with the Fund are material.

Second, Duke's biography in the PPM misrepresented the nature and extent of his expertise by omitting any reference to: the Duke Fraud Action that had been pursued against him, Duke's personal bankruptcy, or the fact that his "experience" at the Texas Railroad Commission was a high-school internship more than 25 years earlier.  These omissions were, as a matter of law, materially misleading.  See, generally, SEC v. Merchant Capital, LLC, 483 F.3d 747, 770-71 (11th Cir. 2007) (it was materially misleading for defendant who touted his business experience to omit to state he had filed for personal bankruptcy); SEC v. Constantin, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013) (misrepresentations about educational background and professional experience are material and would have affected the reasonable investor's choice to invest); Kunz v. SEC, 64 F. App'x 659, 666 (10th Cir. 2003) (litigation history omitted from PPM was important to investors' decisions to purchase investment products).

Finally, Haarman made written misrepresentations to investors regarding the risks associated with the Fund. Haarman emailed potential investors representing that the Fund was a "guaranteed" investment, and that investors had "zero possibility" of losing their principle. However, at the time of the Fund's offering, Defendants had not yet committed the Fund to any particular investment, and at the Fund's conclusion, no investors ultimately recovered their initial investment.

However, Defendants argue that there is a fact question as to whether these statements are material because investment in the Fund was restricted to "accredited investors," who are "sophisticated investors" as defined under Rule 501(a) of Regulation D of the Securities Act. (Dkt. # 77 at 14.) Defendants therefore argue that because Fund investors were provided with "cautionary terms" about the risk of investment in the PPM, whether contradictory statements in "informal emails" are material is a jury question. (Id. at 15.)

"Materiality is defined as what a reasonable investor would consider important in making his investment decision." SEC v. Recile, 10 F.3d 1093, 1097 n. 16 (5th Cir. 1993). Under this standard, the question of whether Haarman's statements painting investment in the Fund as "guaranteed" are statements that a reasonable, sophisticated investor would consider important in making his or her decision to invest is a factual question inappropriate for resolution at summary

judgment.  See SEC v. True North Fin. Corp., 909 F. Supp. 2d 1073, 1102–03 (D.

Minn. 2012) (denying motion for summary judgment and finding genuine disputes

of material fact because whether "sophisticated" or "accredited investors" would

have considered misleading statements "material" is a "highly fact-specific

determination").  Thus, the Court finds that the SEC has failed to establish that

these statements are material as a matter of law.

However, because the Court has found both the statements relating to

the fees paid to Defendants in association with the Fund, as well as the statements

relating to Duke's background constitute material misrepresentations, the SEC has

established the first element of a violation of Section 17(a)(2) and Rule 10b-5 as a

matter of law, as it pertains to those statements.  If the SEC wishes to establish

additional liability and seek  remedies based on Haarman's risk-guarantee

statements, it will have to do so at trial.   Accordingly, the SEC's Motion is

**GRANTED IN PART AND DENIED** as to this element.

### 2.    Mental State

Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require

a showing of scienter, a mental state embracing the intent to deceive, manipulate,

or defraud.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  "To

prove scienter, the SEC need only prove that the defendant acted with severe

recklessness."  SEC v. Sethi, 910 F.3d 198, 206 (5th Cir. 2018) (citing Broad v.

Rockwell Int'l Corp., 642 F.2d 929, 961 (5th Cir. 1981).  "Severe recklessness is

defined as 'those highly unreasonable omissions or misrepresentations that involve

not merely simple or even inexcusable negligence, but an extreme departure from

the standards of ordinary care, and that present a danger of misleading buyers or

sellers which is either known to the defendant or is so obvious that the defendant

must have been aware of it.'"  Id.  Violations of Sections 17(a)(2) and 17(a)(3) of

the Securities Act, however, only require negligence.  Aaron v. SEC, 446 U.S. 680,

696–97 (1980).

        First, the Court finds there is a genuine dispute of material fact as to

whether the representation in the PPM to investors that 100% of the Fund's assets

would be used for the Fund's acquisition of investments was made with severe

recklessness.  While the SEC alludes to admissions by Defendants that they

intended to "bake in" certain fees for themselves, including prior to the Company

B transaction, the SEC has not provided the Court with evidence that Defendants,

at the time they made this representation in the PPM intended to use the Fund's

assets for their own personal gain.  (See Dkt. # 72 at 23.)  Similarly, the Court

finds that Haarman's statement that Defendants would not make any money until

the investors received their 25% return has not been shown to have been made with

scienter, because the SEC has provided no evidence that at the time Haarman made

17

this statement, Defendants intended to pay themselves prior to investors receiving a 25% return.  Accordingly, the SEC's Motion is **DENIED** as to this sub-issue.

Second, the SEC has presented ample, undisputed evidence that Duke acted with scienter as it relates to his misrepresentations regarding his background. The Court finds that the danger of misleading potential investors as to his background would have been obvious to Duke.  Indeed, that was surely the design of his strategic omission of facts pertaining to his checkered past.  Moreover, because Duke co-owned Defendant APEG, his scienter his imputed to APEG. See In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011).  However, Defendants have presented evidence that Haarman was unaware of the omission by Duke of the Duke Fraud Action and his personal bankruptcy, sufficient to create a fact issue for trial as to Haarman's scienter.  Accordingly, the SEC's Motion is **DENIED** as to the sub-issue of Haarman's scienter in this context.

Finally, the Court finds that it was severely reckless for Defendants to misrepresent that the Fund was a guaranteed investment because at the time of these representations, Haarman and Duke had not committed the Fund to any particular investments that would support such a claim.  Accordingly, the Court finds no genuine dispute as to whether Defendants acted with scienter as it pertains to these statements.  Thus, the SEC's Motion is **GRANTED** as to this sub-issue.

18

3.    <u>Connection with Purchase, Offer, or Sale of Any Security</u>

Misrepresentations satisfy the element of being "'in connection with' the purchase or sale of securities if there is a relationship in which the fraud and the [security] sale coincide or are more than tangentially related . . . ." to real or purported transactions in covered securities.  <u>Roland v. Green</u>, 675 F.3d503, 511 (5th Cir. 2012) (emphasis in original) (quoting <u>Madden v. Cowen & Co.</u>, 576 F.3d 957, 966 (9th Cir. 2009)) (citing <u>Kircher v. Putnam Funds Tr.</u>, 547 U.S. 633, 644 (2006)).

Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10) define the term "security" to include any "investment contract".  15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).  The Supreme Court has defined an investment contract as a contract, transaction, or scheme in which (1) a person invests money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of the promoter or a third party.  <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 298-99 (1946).  The Fifth Circuit has long held that a limited-partnership interest is an investment contract and, therefore, a security.  <u>See</u> <u>Williamson v. Tucker</u>, 645 F.2d 404, 423 (5th Cir. 1981).  Therefore, here, the Court finds, as a matter of law, that the investors' limited partnership interests in the Fund are investment-contract securities.

Accordingly, the Court finds that there is no factual dispute as to this element because the identified misrepresentations and omissions are clearly "more than tangentially related" to investment in the Fund.  Thus, the SEC has sufficiently established the third element of its Section 17 and Rule 10b-5 claims.

### 4.     Use of Interstate Commerce

Interstate commerce can be established by a defendant using "emails, phone calls, and wire transfers, to communicate with investors."  Helms, 2015 WL 5010298 at *13.  Here, the parties do not dispute that interstate commerce was used to communicate with investors.  Accordingly, the fourth element for the SEC's Section 17 and Rule 10b-5 claims is established as a matter of law.

Because the Court has found that the SEC has carried its burden to establish all required elements for at least one of its misrepresentation/omission antifraud claims, under Section 17(a)(2), the SEC's Partial Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**

### B.     Fraudulent Scheme/Acts Operating as Fraud

The SEC also moves for summary judgment under Sections 17(a)(1) and (3) based on its theory that Defendants: (1) engaged in a fraudulent scheme by misappropriating investor funds; and/or (2) engaged in a series of transactions, practices, and/or courses of business that operated as fraud.  (See Dkt. # 72 at 21.) Section 17(a)(1) of the Securities Act prevents schemes to defraud in the offer and

sale of securities, while Section 17(a)(3) prevents engaging in "any transaction, practice, or course of business which *operates or would operate as a fraud* or deceit upon the purchasers" in the offer or sale of securities.[3] 15 U.S.C. § 77q(a)(1), (3). (emphasis added).

As an initial matter, the Court notes that in its Motion, the SEC does not appear to meaningfully distinguish between its claims brought under these two sections. (See Dkt. # 72 at 21.) The SEC merely argues that Defendants "engaged in a series of transactions, practices, and/or courses of business that constituted an illegal scheme to defraud." (Id.) As far as the Court can discern, this argument appears to be a consolidation of Sections 17(a)(1) and (3). According to the SEC, Defendants' scheme was most plainly evidenced by their "artificially and improperly inflating the purchase prices of properties" and by using Fund assets to pay Haarman and Duke more than $2.3 million in belatedly disclosed fees (and $200,000 in undisclosed fees). (Id.) The SEC further argues that these fees were not authorized by the PPM or the Partnership Agreement. (Id.) Additionally, it contends that Defendants structured Fund acquisitions to create the "false

---

[3] As discussed above, the Court finds that the limited partnership interests in the Fund are investment contract securities under Fifth Circuit precedent. See Williamson, 645 F.2d at 423.

appearance that they were being paid, not by the Fund, but by the companies selling assets to the Fund." (Id.)

Defendants argue that genuine disputes of material fact exist as to whether a scheme to defraud existed and whether they had the requisite mental state (scienter) under Section 17(a)(1). (Dkt. # 77 at 20–21.) Specifically, Defendants argue that the "adequacy and timing of disclosures" deserve to go before a jury. (Id.)

The Court agrees that the SEC has not carried its burden to demonstrate that there are no genuine issues of material fact as it pertains to its Section 17(a)(1) and (3) claims. Whether the terms of the PPM authorized Defendants' payment of fees to themselves, such that their actions did not operate as a fraud on the Fund's investors, under Section 17, represents a factual question, inappropriate for resolution at summary judgment.[4] Accordingly, the Court **DENIES** the SEC's Motion as it pertains to these claims.

II.    Section 206 Claims

The SEC brings claims under Sections 201(1) and 206(2) of the Advisers Act. Congress created Section 206 of the Advisers Act to prevent

---

[4] The Court notes that, below, in relation to the SEC's Section 206 claim under the Advisers Act, it has found that an investment advisor's failure to disclose an economic conflict of interest operates as fraud, as a matter of law. However, because the SEC's Section 17 claims are distinct from its Section 206 claims, the Court declines to extend its Section 206 analysis to the SEC's Section 17 claims.

fraudulent practices by investment advisers.  SEC v. Capital Gains Research Bur., Inc., 375 U.S. 180, 195 (1963).

Among other things, Section 206 makes it unlawful for an investment adviser, by use of the mails or any means of interstate commerce,[5] to (1) employ any device, scheme or artifice to defraud, or (2) engage in any act, transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client.  See 15 U.S.C. §§ 80b-6(1) & (2); Aaron , 446 U.S. at 691–93, 697.

A.    Investment Advisers

Under the Advisers Act, an investment adviser is "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11).  Advising clients includes "exercising control over what purchases and sales are made with their clients' funds." Abrahamson v. Fleschner, 568 F.2d 862, 871 (2d Cir. 1977).  A defendant who manages client funds and are compensated by a salary or a percentage of the related profits are "investment advisers" within the meaning of the statute.  See United States v. Miller, 833 F.3d 274, 282 (3d Cir. 2016); United States v. Onsa, 523 F. App'x 63, 64-65 (2d Cir.

_____

[5] As noted above, it is undisputed that Defendants used interstate commerce.

2013) (unpublished); Goldstein v. S.E.C., 451 F.3d 873, 876 (D.C. Cir. 2006);

United States v. Elliott, 62 F.3d 1304, 1310-11 (11th Cir. 1995).

      Here, Defendants' conduct satisfies the Advisers Act's definition of

investment adviser.  First, under Duke and Haarman's direction, APEG identified,

facilitated the acquisition of, and managed all of the Fund's investments.  The fact

that Defendants ultimately decided against purchasing stocks or other securities for

the Fund does not mean that they were not "investment advisers" because the Fifth

Circuit has held that advising others as to the advisability of investing in securities

encompasses both "positive and negative advice."  See Living Bens. Asset Mgmt.,

L.L.C. v. Kestrel Aircraft Co., 916 F.3d 528, 534 (5th Cir. 2019).  See also SEC v.

Criterion Wealth Mgmt. Servs., Inc., 599 F.Supp.3d 932, 947 (C.D. Cal. 2022)

("[W]hen a defendant 'discuss[es] or recommend[s] whether a client should

invest'…they act as investment advisers.")

      First, APEG carried out its advisory services for compensation.

Compensation under the Advisers Act includes any economic benefit.  See, e.g.,

U.S. v. Miller, 833 F.3d 274, 282 (3rd Cir. 2016); Elliott, 62 F.3d at 1311.

Compensation is not limited to "a discrete fee specifically earmarked as payment

for investment advice."  Miller, 833 F.3d at 282.  Here, for advising and managing

the Fund's investments, APEG was entitled to an annual management fee equaling

2% of the Fund's asset value.  Further, from 2016 through 2017, the Fund paid APEG management fees totaling $724,560.

Additionally, Haarman and Duke received economic benefit by virtue of their roles in advising the fund, as evidenced by the more than $2.5 million they received during the Fund's existence.  Further, a person that controls an investment adviser firm and its decision making is considered an investment adviser for purposes of the Advisers Act.  See SEC v. Berger, 244 F.Supp.2d 180, 193 (S.D.N.Y. 2001) ("Because [defendant] effectively controlled [investment adviser firm] and its decision making, [defendant] is also properly labeled an investment adviser within the meaning of the Advisers Act.").  Thus, because the Court finds that APEG meets the definition of "investment adviser," it similarly finds Haarman and Duke meet that definition.

B.    Conflict of Interest

Section 206 establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients.  See Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 17 (1979).  An adviser's fiduciary duties include "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts."  Capital Gains, 375 U.S. at 194.  The existence of a conflict of interest— potential or otherwise—is a material fact which an investment adviser must disclose to its clients.  See id. at 191–92, 201; Vernazza v. SEC, 327 F.3d 851, 859

(9th Cir. 2003) ("[i]t is indisputable that potential conflicts of interest are 'material' facts with respect to clients"). Specifically, economic conflicts of interest, such as undisclosed fee arrangements, must be disclosed. See Robare Grp., Ltd. V. SEC, 922 F.3d. 468, 475–76 (D.C. Cir. 2019). Failure to disclose a conflict of interest is conduct that operates as fraud under Section 206(1) and (2). See Capital Gains, 375 U.S. at 191–93, 200–01.

Defendants' payment of fees to Haarman and Duke, totaling over $2.5 million, created an economic conflict of interest that they failed to timely disclose, despite being required by their fiduciary duties to do so. See Capital Gains, 375 U.S. at 200–01. Their earning of these fees at the expense of the Fund were directly antithetical to preserving the investors' capital and maximizing the represented (and guaranteed) 25% investment returns.

Defendants argue that under the terms of the "Offering Materials" of the Fund (including the PPM, Limited Partnership Agreement, and the Subscription Agreement), the Fund was authorized to "employ or engage affiliates" of Angelus/APEG to "provide services" to the Fund at "competitive market rates." (Dkt. # 77 at 4.) Moreover, Defendants argue that the eventual disclosure of the fees in the audited financial statement was consistent with the terms of the Offering Materials. (Id. at 21.) Therefore, Defendants argue that there are genuine disputes of material fact both as to whether they were permitted to pay themselves the

26

belatedly disclosed fees, under the terms of the Offering Materials, and whether the fees paid were at "competitive market rates."  (Id. at 11.)

However, the Court need not make a factual finding to conclude that, as a matter of law, the language in the Offering Materials stating that Defendants *might* possibly make such payments, does not excuse Defendants for failing to disclose such payments once they actually elected to do so.  See Criterion Wealth Mngt. Servs., Inc., 599 F.Supp.3d 932, 952 (C.D. Cal. 2022) ("Vague disclosures about how an adviser 'might be deriving additional compensation from their trading activities' are inadequate when the adviser is 'actually doing so' and fails to apprise clients of the same.").  Further, Defendants' argument that there is a factual dispute as to whether the amount they paid themselves was in excess of "competitive market rates", misses the point.  Investment advisers owe a fiduciary duty to disclose all potential conflicts of interest "accurately and completely, Vernazza v. S.E.C., 327 F.3d 851, 860 (9th Cir.), "in a manner that would enable their clients to understand the source and nature of the conflicts," Robare Grp., 922 F.3d at 477.  Thus, Defendants breached their fiduciary duty to the Fund's investors simply by failing to disclose the fees paid to themselves within a time period that would have allowed investors to understand Defendants' conflicts of interest – regardless of the fee amount.  Instead, Defendants waited more than a year, and for

the earliest transactions, almost two years, to disclose the more than $2.5 million

they had paid themselves, via the "audited financial statement."

Accordingly, the Court finds as a matter of law that Defendants'

incredibly delayed disclosure of their economic conflict of interest, in the form of

their fee arrangement, operates as fraud under Section 206(1) and (2).  See Capital

Gains, 375 U.S. at 191-93, 200–01.

C.    Mental State

"Scienter is required to show a violation of § 206(1) and negligence is

sufficient to show a violation of § 206(2)."  SEC v. Jaitley, 2024 WL 36011, at *4

(W.D. Tex. Jan. 3, 2024) (quoting Steadman v SEC, 603 F.2d 1126, 1134 (5th Cir.

1979)) (internal quotation marks omitted).  See also Capital Gains, 375 U.S. at 184

& 191–92.  As discussed above, to prove scienter, the SEC need only prove that

the Defendants acted with "severe recklessness."  Sethi, 910 F.3d at 206.  Severe

recklessness is shown when there is an "extreme departure from the standards of

ordinary care."  (Id.)

Here, the SEC has provided undisputed evidence that Defendants

knew of their economic conflicts of interest and receipt of undisclosed[6] and

belatedly disclosed fees but nevertheless failed to disclose any of those fees until

---

[6] The Court notes that $200,000 of Defendants' fees were never disclosed to
investors in the Fund.

December 15, 2017.  (See Dkt. # 72 at 22.)  This alone supports a finding that

Defendants acted with at least severe recklessness to conceal their economic

conflict of interest.  See SEC v. Verges, 2024 WL 531260, at *8 (N.D. Tex. 2024)

(quoting Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1019 (5th Cir. 1996))

(Scienter may be inferred from a defendant's motive or circumstances that indicate

conscious behavior on the part of the defendant); Mun. Employees' Ret. Sys. of

Michigan v. Pier 1 Imports, Inc., 935 F.3d 424, 430 (5th Cir. 2019) ("Both intent

and "severe recklessness" are sufficient.")

   In addition, the SEC has provided undisputed evidence that

Defendants structured deals such that it appeared that the selling parties would pay

"consulting fees" to Haarman and Duke.  This further supports the inference that

Defendants had the requisite mental state, given they took specific steps to "bake

in" fees for themselves.  Because the Court finds Defendants acted with at least

severe recklessness, the SEC has proved the necessary mental state for both

Section 206(1) and Section 206(2).  See Jaitley, 2024 WL 36011, at *4.

   Accordingly, the Court finds that the SEC has carried its summary

judgement burden, identifying evidence supporting summary judgment on each

element of the alleged violations of Section 206(1) and Section 206(2).

Defendants have not carried their burden to identify any genuine disputes of

material fact as it pertains to these claims.  The Court therefore **GRANTS**

summary judgment for the SEC on its Section 206 claims.  See SEC v. Westport Capital Markets LLC, 408 F.Supp.3d 93 (D. Conn. 2019) (granting summary judgment on Section 206(2) of the Advisers Act due to failure to disclose conflicts of interest); SEC v. Criterion Wealth Management Services, Inc., 599 F.Supp.3d 932 (C.D. Cal. 2022) (same); SEC v. The Nutmeg Group, LLC, 162 F.Supp.3d 754, 780 (N.D. Ill. 2016) (same).

CONCLUSION

For the reasons stated above, the SEC's Partial Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.**  (Dkt. # 72.)

**IT IS ORDERED** that within 60 days of the date of this Order, the SEC is to advise the Court whether it intends to proceed to trial on all or some of the claims for which the Court has not found liability.

**IT IS SO ORDERED.**

**SIGNED:** Austin, Texas, March 7, 2025.



_____

David Alan Ezra
Senior United States District Judge

30